Third case this morning is Clintworth v. Valley Forge Insurance Company. Counsel for the appellant, if you would make your appearance and proceed. Mark Stanley for the appellant, Jason Clintworth, Your Honors. And it's my intention to reserve three minutes for my rebuttal, if it pleases the court. In determining the relevant evidence and the allowable defenses on cases arising out of uninsured motorist benefits in Oklahoma, both the Oklahoma Supreme Court and this Tenth Circuit have distinguished between cases involving breach of contract claims and those that deal with bad faith claims alone, with no breach of contract claim going along with it. Particularly in the Oklahoma Supreme Court case of Buzzard v. Farmers, the Supreme Court limited the insurance company, not the insured, to the evidence the insurance company had obtained at the time their performance was requested and refused. This court, not only in Vining v. Enterprise, but also Timberlake v. U.S. Fidelity, held that the allowable defenses are those actually relied upon by the insurance company in denying the claim, and that that was true even though other defenses may have existed. If they didn't actually rely upon them, they could not be raised. This case before this court is a straight bad faith claim with no accompanying breach of contract claim. The cases relied upon by the Northern District in granting the summary judgment all deal with breach of contract cases. Particularly those are Porter v. State Farm and the Gates case. The uncontroverted facts presented to the court below were that this car wreck, the underlying car wreck, happened on March 9th, 2016. On that same night, Mr. Clintworth called his agent, Mark Tadford, and reported the car wreck. The agent, Mr. Tadford, sent what's called a notice of claim the next day on March 10th, 2016, to the Valley Forge insurance company. Under Oklahoma law, particularly 36OS section 1435.3, Mr. Tadford, for those purposes, was the agent of Valley Forge. That the policy set forth that in order to make an accident claim, suit, or loss, the insured must present a document showing how and where the accident occurred, the insured's name and address, and to the extent possible, the name and address of the injured persons and witnesses. It was uncontroverted that that notice of claim complied. In fact, the next day on March 11th, 2016, Valley Forge insurance responded with acknowledgement of claim for it, acknowledging that the claim had been made. The appellee did not begin its investigation, it's uncontroverted, until December of 2016, nevertheless. On the UM claim? Yes, sir. Yes, sir, that's accurate. That what you said so far, I think is absolutely, indisputably correct, but it avoids the elephant in the room that there had been no submission of a UM claim when the agent contacted Valley Forge. Well, I would say this, that the policy does not distinguish how to make a UM claim versus any other claim. The policy says merely to make a claim, and it doesn't distinguish that you make a claim for liability, a claim for comprehensive, a claim for med pay, or a claim for uninsured motorist. You simply make a claim, and this is how you do it. But your argument focuses on the notion of delay, and I think what the district court said is when you're looking at a UM claim, there has to be some reasonable basis to believe that, in fact, you'd end up in a situation where there wouldn't be coverage from the parties to cover the damage. And according to the district court, that wasn't until things took a turn for the worse with respect to your clients, such that the medical bills were such that one reasonably could believe that UM coverage might be implicated. And so the bottom line, I think, under that rationale is even if you view what your client did as a claim in the formalistic sense of it, that did not necessarily implicate the duty that you're talking about, which was a duty to investigate. I think that's the rationale of the district court, and I'd like to know why that isn't reasonable. I think it's inconsistent with Oklahoma law, first of all. Buzzer, Christian, the landmark cases in Oklahoma, as I'm sure you're aware, that deal with this, require the insurance company to come in upon notice of a claim and immediately investigate. Now, I think for each one of these cases, UM claims that you're talking about. They're a bad faith case. No, but the point I'm making is the wrinkle that causes the district court to believe the delay here was not unreasonable. Delay, as you know, as it were, was not unreasonable. Turn specifically on the notion that you were making a UM claim. And so what I'm asking is, is this case law that you're invoking, are there strands of that to speak specifically to a UM claim? Yes, sir. The buzzer versus farmer's case was an uninsured motorist case where Troy buzzard was killed in an automobile collision with the city of Norman. The city of Norman at that time, I believe, had a $60,000 maximum recovery and they had not tendered that. Farmers took the position that we're not going to investigate because until the policy limits are tendered, there is no UM claim. The claim is not worth more than liability. The Oklahoma Supreme Court rejected that argument and said, you must go about the business immediately of investigating. And I think there's a distinction between when a UM claim is payable versus when an uninsured motorist company has a duty to start investigating. And the next day, the next day, in fact, the adjuster testified that he took a statement which he did not record and found out Mr. Clitworth was injured as seeing a doctor. But there was no UM claim per se presented at that early juncture, right? Well, I disagree, your honor. And I think this again, the policy doesn't say here's how you make an uninsured motorist claim. The policy simply sets out in the event of an accident, claim, suit or loss. You must provide us information of how and where the accident occurred, the insurance name and address, and to the extent possible, the name and address of the injured persons. Now, Oklahoma law, and it's an Eastern District case, sets forth that under the Unfair Settlement Practices Act, it's the insurance company's duty to disclose coverage, which is not enough to say you have an uninsured motorist company, but to help you set up a claim. But the policy itself, and again, at this time, Mr. Clitworth is unrepresented except by the lawyer appointed to him by Valley Forge to represent him without limitation. Counselor, isn't this a bad faith claim? Yes, sir. Well, then how then if the if the insurance company is notified of an accident and all of that has been agreed to. But there's you're saying that the duty arises simultaneously at that time to investigate the uninsured motorist. This is Oklahoma law to investigate the accident as to uninsured motorist and that failure to do that is bad faith? Yes. Well, where's where's the notice in regards to all of this as the bad faith? Well, what I'm saying, Your Honor, is this they're on notice of an injury. They call the man and they're on notice of a car wreck and everything that's required under the policy for this person. The Oklahoma courts have never invoked an additional duty on an insured to make a claim other than what's in the policy. In fact, Justice Holmes was involved in a case called Porter versus Farmers, where he said you look to the policy to determine what's required for notice. And that was a U.N. case. And once they did that, they should have investigated. And in fact, they did take the statement of the insured and he told him he was injured and seeing a doctor. But his injuries at that point were fairly minor. I mean, it wasn't until he had to have the surgery. Right. That things went downhill fast. Well, the injuries that he incurred were already in existence because the car wreck happened. But he didn't he didn't he walked away, didn't he, from the car wreck and didn't claim there wasn't a significant injury. Well, he did complain there was an injury, Judge Holmes, but but what we he didn't again, this man. And I think it's important to note that this man was in a failing business at the time that did go out of business in early May. He was having emotional problems relating to it and he didn't have the funds to see the doctors. And he got his shoulder surgery, I believe, in June of 2016. It was diagnosed earlier than that. But he was having to really struggle with funds. He had emotional injuries that he couldn't afford to see a psychologist or psychiatry for. But a friend offered him to pay for it if he would see a clergyman because the point would be in part what the insurance company knew about all of these things in real time. And I just want to play out just so I understand your argument. Let me just play it out to what I see is a logical extension of it. If you are you saying that let's let's make it sort of hypothetical, but playing on these facts, let's say there's a car accident. Right. And and maybe I feel like I scratched my hand. But other than that, I have no injury. I walk out of it. I feel fine. I call the insurance company. I say I had a car accident. You know, I don't think it's my fault. I did get my hand scratched. I got the information of the other people. Full stop. That's what I tell them. Then are you telling me that at that time, the insurance company had an obligation? Say, well, well, you have U.N. coverage and I need to start investigating the possibility of U.N. of a U.N. claim, even though I didn't utter those words when I called the insurance company. Is that your position? I think if you comply with the policy, they have a duty to come in and investigate the wreck. And all of the coverage is under those policies to make it part of their investigation to determine what claims you have and help you set those up, pursue it to an investigation. And I think your question, with all due respect, goes to when they have a duty to pay. No, no. It has to duty. It has to do with when they have a duty to investigate. That's what you're talking about. And my hypothetical may not have been clear, but I tried to make it clear. Well, my hypothetical posit very minor injury. OK, I walk out of that car. I can tell you I only I have a little scratch on my hand. OK, I call the insurance company. I make a generic claim. I tell them the things that are required in the policy. So I just want you to answer. Is it your position that in a situation like that, the insurance company has an obligation to investigate the potential of a claim because that's part of your policy coverage? When I give you just that information, I'm sorry, I understand. I would say this, that under Brown versus Patel, they have a duty to do an investigation reasonable under the circumstances. And the question would be, is that reasonable under your hypothetical? Yes, I would probably say that's correct. That was not the case here. It was reasonable under the circumstances not to investigate under my hypothetical. Well, I would say that that was that they did investigate and found out he had a scratch in the hand and there was nothing else. And there was nothing else for them to investigate in order to determine that his claim did not exceed liability. However, this case was different. And in this case, they knew that he was having difficulty working. They knew that he was seeing a doctor, that he was injured, and they didn't go past that to determine the nature and extent of his injuries. They simply refused to investigate. And I'll point out, pursuant to Vining and pursuant to Buzzard, the only reason given is none of this as set forth by the court, by the Northern District. The reason given by the adjuster in his deposition and the only reason he didn't investigate is they have a secret undisclosed requirement that unless you tell me the adjuster, I want to make a claim under my uninsured voters policy. We will not investigate. And all these issues that. The facts of this case, as I understand it, in your case, the not only did your client receive money from the insurance company, I think it was in the form of what, one hundred to one hundred and fifty thousand. Fifty thousand. How much? Two hundred fifty thousand. But that was not for over a year later. Well, it doesn't matter. It shows that as far the initial requirement under the policy, they acknowledge their obligation and they made payments in regards to this. Your client didn't have to sue him, did he? Well, did your client have to sue? They got one hundred and two hundred thousand dollars. The question here before me is I see it is, is there bad faith under the policy to to reach out as far as you're saying that the minute that you know that there's an accident, even if I determine that under the policy, I owe money and I do, if I don't investigate the uninsured motorist starting at the day of notification that under Oklahoma law is bad faith. Well, I would say this. I'm out of time, but I'll answer your question. I think in this case, this case is not only one where they delayed and delayed the investigation when they did the investigation. The only thing they did is hire a lawyer to determine the nature, extent, causation and the amount of damages of my client. And he's not. I'm sorry. That's not wrong. I mean, what's illegal about doing that? Well, the lawyer is not a competent to diagnose injuries. He's not competent to determine what caused the injuries. And the northern district ruled the same way he's nor nor is he competent. And what he chose to do is to ignore some of the injuries and determine they didn't exist or what they were. He never got into what we call category two damages, which were the the earning loss of earning capacity, which is undisputed, was one point nine million dollars. Is that bad faith, though, in looking at the uninsured voters from day one? Well, it's it's different, Your Honor, if I may. One is saying that you delayed the investigation nine months. The other one is saying once you began the investigation in December of 2016, nine months later, the investigation you did was inadequate because you didn't you didn't adequately investigate his injuries. You didn't use your tools under the policy. You just had your lawyer who's incompetent determine what his injuries were and what caused them and what his future would be regarding them. He chose to ignore totally his loss of earning capacity for no reason. He's just said, I didn't think much of it. He chose not to look at the permanency of his shoulder injury. He knew that my client had been unable to continue treatment with his shoulder doctor because he couldn't afford the payment. He knew that my client was still seeing a chiropractor for his strange sprain injuries and would continue to see the chiropractor. But he gave no deference to the future medical or the future pain and suffering. He knew my client was still suffering from the ringing in his ear called tinnitus. Yet he refused to evaluate the claim for the future pain and suffering and future medical bills associated with it. Council under the evidence was the first time that your client made any claim that possibly involved uninsured motors. It was some six or seven months or eight months into it, wasn't it? Well, you know, that's my question. You may claim that night, but number two, he when he hired you not have a claim of uninsured motors that night. My question is, when was the first time that your client made a claim to the insurance company that would involve the uninsured motors? And as I recall, the record, it was some six, seven, eight months later. Isn't that right? Well, what the judge determined is when his lawyer, Adam Weintraub, sent in a letter containing documents and on November 30th, 2016. Mr. Weintraub also sent a letter in June asking them to consider uninsured motors. He also sent another letter in July asking them to consider uninsured motors. Still, they didn't investigate. There was also an email that my client sent on April 13th. His agent, Mr. Tedford, told him, you've got an insured motors. They should be paying this on April right before April 13th. So he sent an email to the adjuster, Doug Graham. Mr. Graham testified he never saw the email, although it's unrefuted. He received it on April 13th. He said it went to junk mail possibly. I can assure you that this panel will look very carefully at the record involved in this. I appreciate your answer to my question. Okay. Thank you. Mr. Stanley, you've exceeded your time. However, I'm going to give you one minute on rebuttal, but we'll hear from Mr. Haskins now. May I proceed, Your Honor? Please. May it please the court. My name is Walt Haskins. I represent Valley Forge Insurance Company. The court has very succinctly addressed the issue that is at the heart of this appeal. That is, when was an uninsured motorist claim first made? Judge Baldock, you said to appellant's counsel when he represented to the court that an uninsured motorist claim was made when the accident was reported, and you told him that that was simply untrue. And it reminded me of an argument that I had in front of you 28 years ago, a case called Croft v. Walmart, which at the end of it you looked at me as a much younger lawyer and said, young man, in every trial there are two cases, one the case you tried and one the case you wish you had tried. And those words resonated with me through the rest of my career. And I would suggest to the court that the presentation that you have received from appellant's counsel is much the same. It's not the facts as they were, but as the facts as appellant wishes they were. The record is very clear in terms of what was reported to the insurer and what claims were made. There was a report of the accident made the day of the loss. And in that report specifically, there was no description of any injury whatsoever to Mr. Clintworth. The only injury reported was a death to a passenger in the Mottoyer vehicle, which was two behind Mr. Clintworth's vehicle. Counsel refers to the fact that the company acknowledged receipt of the accident information. He refers to it as receipt of a claim. If the court will review the record that he cites to, which is in volume 12, pages 3156 to 7, the court will note that it is not an acknowledgment of an uninsured motorist claim. It is an acknowledgment of the property damage claim of Mr. Clintworth's employer, ALK, for the vehicle he was driving. The record is entirely devoid of any claim or assertion of any right to recovery under the uninsured motorist coverage that was actually received by the company in any meaningful form until the November 29, 2016 letter from Mr. Weintraub was received on December 6 of 2016. Counsel for plaintiff, excuse me, appellant, indicates to the court that two days following the accident, he reported to his agent that he had some injury. The report was actually that he had been to his chiropractor to be checked out to see if he had any injury. Several days thereafter, he was asked, do you want us to open a medical payments claim under the policy? For there was $2,000 in medical payments coverage that was provided. It was inadvertently opened as $5,000 worth of coverage. At that time, Mr. Clintworth said he did not even want a medical payments claim opened. In April of 2016, he indicated that he wanted to have a medical payments claim opened, which was opened within, I believe, 60 seconds of the time he made that request. For these entries are very carefully logged in and recorded. And under that coverage over the preceding, or excuse me, the following four months, his medical bills were paid in excess of $4,600 with the accidental listing of $5,000 of coverage under the medical payments coverage. Counsel for appellant has suggested to the court that the appellant sent an email in April of 2016 saying he wanted uninsured motorist coverage. What actually that email said was he wanted to get some financial relief by tapping into my uninsured motorist coverage. Could you tell me with whom to speak? That email, it is uncontroverted, was never observed by a living human being at Valley Forge Insurance. For reasons that could be only known to Microsoft, for some reason, it went into a synchronization subfolder called conflicts. No one has any explanation as to why that's where it went, but it was absolutely uncontroverted that that email was never seen by living human being. In fact, Mr. Clintworth, when he responded to written discovery in this case, initially denied that he had had any writings whatsoever with the insurance company. It wasn't until well into this litigation when I was taking his deposition that he then, and this is some three years after the fact, he remembered that he had sent an email. His lawyers then provided it. Valley Forge was able to go back in, look at all of the computers to which it might have gone, and it was discovered in the synchronization subfolder conflicts. It is uncontroverted that that was never communicated in any meaningful form to Valley Forge. The next communication that occurred by appellant was a letter that was dated June 15 of 2016. This letter, curiously, was not received until 11, 12, and 56 seconds a.m. the morning of July 13, 2016. And we know that, and it's in the record at volume five, page 1203, because when a communication is received, it is date and time stamped to the very second. That letter simply requested information as to whether there even was uninsured motorist coverage. The record is uncontroverted, contrary to the allegations of appellant, that the company never responded to the letter. It is uncontroverted, again in the record at volume five, page 1205, that approximately two hours later, Valley Forge responded to that with an email to Mr. Weintraub saying, In fact, there is liability coverage on the two vehicles that caused the accident. The state minimums are $25,000. We only know of $4,673 that was paid under the MedPay coverage. At this point, there is still no indication that he wishes to assert an uninsured motorist claim. Yeah, but on that particular email exchange, I'm trying to listen closely to you. I had read the material, but I'm focusing on how you are restating it. Well, in that email exchange, that email, did they respond to his question, whether there was UM coverage? Yes, they did respond that there is UM coverage, but, and we can look at the actual language of it. Yeah, I'll go back and look at it. But so they did answer the question, but just, but included information suggesting that the UM coverage would not have been triggered. Would not be applicable. And remember by this point, with all respect to appellant, It's obvious he was well aware of the fact that there was uninsured motorist coverage for it is uncontroverted that he sent the email in April of 2016 expressly talking about the fact there was uninsured motorist coverage. He responded in discovery. And it is written discovery recorded in the record that he knew in March of 2016 following this accident, there was uninsured motorist coverage, because when he originally responded to interrogatories. He didn't really respond. There was a motion to compel. He supplemented his answers to interrogatories and said, when I contacted the insurance company, they told me there was uninsured motorist coverage. So it is absolutely uncontroverted that he was well aware that there was uninsured motorist coverage. As of the time, the June 15, 2016 letter was sent and received. Council, let me ask you this question. Yes, sir. At that point in time, and the question is the duty to look into this and whether or not that's bad faith. But at that point in time, shouldn't an agent of the insurance company, knowing the responsibility that lies on the insurance company, been under notification that he has a duty. At least to follow up on the uninsured motorist, not whether it's bad faith, but at that point, would not a duty have arise. There is no law in the state of Oklahoma, Your Honor, suggesting that an insurer has a duty to investigate a claim that has not been made. And again, with all respect to appellant, the suggestion that an insurer is required to investigate all potential claims that may or may not be made arising from an accident. And frankly, taken to its logical extension is exactly as Judge Holmes indicated. I've got a scratch on my finger. It simply defies imagination. Under those circumstances, it would be requiring out of every automobile accident that ever happens, that all potential claims be investigated. Whether the insured chooses to make a claim, may not have facts to support such a claim, or may just be of a nature they do not wish to make such a claim. I thought I understood opposing counsel for you to say that there was a clear Oklahoma Supreme Court case that addressed this issue. I thought I heard him say that as well, Your Honor. I thought he referred to Buzzard. Buzzard certainly does not stand for the proposition that an insurer has an obligation to investigate a claim that hasn't even been made. There is no law in the state of Oklahoma that would make such a requirement. Mr. Hess, let me ask you about how this is out in this particular case. As I understand it, the lawyer for Valley Forge contacts Mr. Daniels and asks if Mr. Clintworth is going to make a U.M. claim, right? He does. And then he says no. And then ultimately, the lawyer relies on a probate claim that had been submitted in the Cervantes estate and relies on the fact that Mr. Clintworth had submitted total damages in the Cervantes probate claim of $300,000. The argument that you've made in your brief is, well, we valued it at $250,000. It's roughly what Clintworth himself had approximated as total damages. Am I right so far? You are right. But with all respect, Judge Bacharach, you're jumping a little bit ahead of the issue of when the claim was made. No, I get that. And I'm putting that issue aside. My question is, was the probate claim submitted in the Cervantes estate submitted by Mr. Daniels? Because as I understand it, he would have been the only lawyer. No. It wasn't? No, no, no, no. It's submitted by Mr. Weintraub. And the timing of that, Your Honor, is that approximately November 13 of 2016, Mr. Weintraub files a creditor's claim in the estate of Linda Daniels, asserting that Mr. Clintworth's damages are in the sum of $300,000. Okay. He then submits a letter dated November 29 of 2016, received by the insurer on December 6 of 2016, saying that the claim is approximately $3 million. Then in the Linda Daniels – excuse me, the Linda Cervantes estate, Mr. Daniels – not Mr. Daniels – Mr. Weintraub submits a second creditor's claim in January of 2017 in the same estate proceeding, where he again values the damages of Mr. Clintworth at $300,000. Okay. And that is all during the period of time that Valley Forge has gone out and has retained Peter Wheeler to investigate, try to find out what's going on, because frankly, we've had a claim where the insured, through Mr. Weintraub, has affirmatively told the company, we are not making a U.M. claim at this time. And that is in July of 2016. Suddenly, the insurance company gets a claim for $3 million, and they went to outside counsel, asking outside counsel to investigate it and to evaluate it and to make recommendations. And the court can readily read the letter of – and I will not belabor the point. It is as thorough an investigation as one will ever see in an uninsured motorist case. Yes, sir. What's your best case that you rely on for your position? Which of the positions, Your Honor? Any of them. What's your best case that you want us to share with us? I think the Badillo case is probably the closest decision that is Oklahoma law. But frankly, I think that Judge Holmes has authored an opinion, and it is an unpublished opinion in the case of Harris v. Progressive Insurance in 2018, that very succinctly goes through, talks about what Oklahoma law and bad faith is. Succinctly? That doesn't sound like one of my opinions, but I'll take your word for it.  In any event, Judge Holmes goes through Oklahoma bad faith law in great detail, talking about what the burdens are, how once the insurer evaluates a claim and deliberates, it handles the claim, that once that is done, then the burden shifts back to the insured to show some other evidence of bad faith. And frankly, there was not a scintilla of evidence in this case that at any time this insurance company did anything, and I'm finishing up, that did anything other to handle this in complete good faith. Thank you. With that, I'm open to any other questions. I apologize for exceeding my time briefly. That's all right. Any other questions? All right. Two minutes for Mr. Stanley. Mr. Stanley, let me ask you this question, because I didn't get the cite that you made earlier to an Oklahoma case, but I would like to know also from you, what is your best case that you want to cite to us that would support you? I guess it would depend on the issue, but I would say Buzzard v. Farmers, and you want the case citation. I know the case. I just wanted to be sure that I had and understood what you said earlier. You got the citation, Your Honor? Yes. Okay. Let me start by saying, and I want to address something you asked me earlier, and I want to encourage you to look at the record. What's undisputed is that my client went to his agent and found out that you have uninsured motors. They should be paying. Send this email to the adjuster. That agent was the agent for Valley Forge. It's unarguable that at that time, my client submitted a claim to the insurance company. Number two, Judge Holmes has addressed the issue of when you make a claim under uninsured motors, and it was in the case of Porter v. Farmers. In that case, Justice Holmes, you indicated that the man never told him he was injured, never told him another car was involved, and the policy required that in order to make a claim. You didn't go to another part of the policy. More than that, the case is relied upon by the Northern District in determining that the insured has a duty to present a prima facie case to the insurance company in order to make a claim. Those are breach of contract cases, and they don't even talk about how the original claim was made with the insurance company. What they're talking about is what a plaintiff must prove to get to a jury once a lawsuit is filed, not how to make a claim. They didn't even discuss that a claim was made or not. In fact, a claim was made under both cases, and they were investigated and evaluated and determined to be less than policy limits. And the amount of the evaluation was not even in dispute. Those are summary judgment cases. In this case, Buzzard v. Farmers deals with this issue and says, once you find out about the claim, you go evaluate it. That's how you know whether or not insurance company that the claim exceeds policy limits is through your investigation that the policy gives you the right to do. Having said all that, I don't want to lose sight of the fact this. Wrap it up, Mr. Stanley. Yes, sir. In the November 30th letter, Mr. Weintraub, the attorney for my client, sent in a demand, and it contained an estimate of over $2 million for loss of earning capacity. What the appellee wants to say is, look what we did on the stuff we did investigate. They acknowledge they never investigated, never evaluated loss of earning capacity of Jason Clintworth. Just chose to throw it away. And they say because we evaluated part of it and investigated part of it, we have complied with good faith, but we have ignored the biggest part of your claim. How could we be guilty of bad faith? And it is uncontroversial. The judge in the northern district didn't refute the fact that it's now uncontroversial. That the amount of his loss of earning capacity was $1.9 million. And when I asked Mr. Wheeler, why didn't you investigate that? He said, I just didn't think much of it. And under this court's rulings and binding and timings, they're stuck with that. That's the basis. All right. Thank you. Thank you for your arguments, counsel. Case is submitted.